UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| GEORGE LANG, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIV.____ |
| v. | : | |
| | : | |
| | : | OCTOBER 20, 2017 |
| BARCLAYS SERVICES CORPORATION, | : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendant. | : | |

_____:

## COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

## I.    PRELIMINARY STATEMENT

1.    Plaintiff George Lang (hereinafter "Plaintiff") brings this action against

Defendant employer Barclays Services Corporation, (hereinafter "Defendant" or "Barclays")

seeking declaratory judgment pursuant to Fed. R. Civ. Pro. 57, and Declaratory Judgment Act

(DJA) 28 U.S.C. §2201; for breach of covenant of good faith and fair dealing against Defendant;

and for its unlawful regarded as disabled discrimination and retaliation, in violation of the

Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 and 12102 and New York Human

Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.

Plaintiff specifically seeks a declaratory judgment as to the unenforceability of the

arbitration provision set forth in his offer of employment letter. Plaintiff respectfully requests

that this Court determine first whether the arbitration paragraph in the offer letter is

unenforceable as a matter of law.

## II.    JURISDICTION, VENUE & PARTIES

2.    This action is authorized and instituted pursuant to 42 U.S.C. § 1331, 42 U.S.C. § 1332.

3.    This Court has jurisdiction to render declaratory judgment pursuant to 28 U.S.C. § 2201.

4.    All of the allegations made herein occurred within the territorial jurisdiction of the United States District Court for the Southern District of New York.

5.    Plaintiff George Lang is a resident of the State of New Jersey with his principal place of residence in Jersey City, NJ.

6.    The Defendant is subject to the personal jurisdiction of this Court as a non-domestic corporation here in the Southern District of New York.  Defendant regularly transacts business, supplies goods and services within Southern District of New York.

7.    Venue is proper as Defendant is an international corporation with United States headquarters located at 745 Seventh Avenue, New York, New York 10019. Plaintiff worked at Defendant's office located at 1301 Avenue of the Americas, New York, NY 10019. On information and belief, Defendant also has an administrative office located at 200 Park Avenue, New York, New York, 10166.

## II.    PROCEDURAL PREREQUISITES

6.    On October 21, 2016, Plaintiff filed a dual charge of discrimination against the Defendant with the United States Equal Employment Opportunity Commission ("EEOC"), Charge No. 520-2017-01362 and the New York State Division of Human Rights (NYDHR).

7.    On July 26, 2017, the EEOC issued a Notice of Right to Sue (Exhibit A). All administrative prerequisites have been satisfied.

## III.    FACTUAL BACKGROUND

### A.    DECLARATORY JUDGMENT

8.      On January 7, 2015, Mr. Lang began his employment with Defendant as its Assistant

Vice President in the Global Technology Department or, more specifically, its TFM.Net

Development Lead.

9.      On or about, December 10, 2014, Mr. Lang was presented with an offer letter from

Defendant, including the details of his employment. (Exhibit B). Buried in the middle of this

offer letter, at page three of five, is a paragraph titled, "Agreement to Arbitrate Employment

Disputes."  The arbitration paragraph (hereinafter "arbitration paragraph") reads:

> Agreement to Arbitrate Employment Disputes: You and Barclays
> mutually agree that any dispute or controversy arising under or in
> connection with your employment, including any dispute regarding your
> compensation or the termination of your employment or any dispute
> arising under any contract of employment, shall be settled on an individual
> basis by arbitration before FINRA, in accordance with its rules as then in
> effect, and any award or judgment therein may be entered in any court in
> New York, New York having jurisdiction. This Arbitration Agreement
> applies to, but is not limited to, any and all claims arising under any
> federal, state or municipal discrimination, wage payment or fair
> employment practices law, statute, or regulation, or under common law.
> For the avoidance of doubt, if controlling legislation (such as the Dodd-
> Frank Wall Street Reform and Consumer Protection Act) prohibits
> mandatory arbitration of claims arising under such legislation, such claim
> may be brought, at your election, either through arbitration or through
> such other avenues as permitted by law.

(Plaintiff offer letter, p.3).

10.     The arbitration paragraph was not bold face.

11.     The arbitration paragraph was drafted in the same font and size as the rest of the offer

letter's language.

12.     The arbitration paragraph was inconspicuous and hidden in the middle of the body of the offer letter at the top of page 3 of 5.

13.     The arbitration paragraph does not include jury waiver language.

14.     Plaintiff did not assent to this arbitration paragraph.  There was no meeting of the minds.

15.     Plaintiff does not recall ever reading this arbitration paragraph.

16.     No one from Defendant explained the language of the arbitration paragraph to Plaintiff.

17.     No one from Defendant explained to Plaintiff that he was waiving his right to a jury trial.

18.     Plaintiff did not understand that he was waiving his Seventh Amendment right to a jury trial by accepting the terms of the offer letter.

19.     Plaintiff did not understand the language in the arbitration paragraph.

20.     Plaintiff was not given a reasonable time to read and consider the terms of this offer letter.

21.     There was a substantial disparity in bargaining power between the parties.

22.     No one from Defendant suggested to Plaintiff that he should have legal counsel review the offer letter.

23.     Plaintiff was not allowed to negotiate the terms of the offer letter.

24.     Plaintiff does not recall signing the offer letter.

25.     During Plaintiff's employment he was discriminated against because he was regarded as disabled.  He also suffered a hostile work environment as a result of the regarded as discrimination.

26.     On October 21, 2016, Plaintiff filed a Charge of Discrimination with the EEOC. (EEOC Charge No. 520-2017-01362).

27.     Plaintiff received a release of Jurisdiction from the EEOC on July 26, 2017. (Exhibit A).

4

28.     On August 3, 2017, counsel for Defendant, Katrina Baker, contacted Plaintiff's counsel and suggested Plaintiff's claims were subject to the arbitration provision in the offer letter.

29.     This contact put Plaintiff on notice that there is an actual controversy between parties that must be resolved by declaratory judgment.

## B.     PERCEIVED AS DISABLED AND HOSTILE WORK ENVIRONMENT

30.     On January 7, 2015, Mr. Lang began his employment at Barclays as a TFM.Net Development Lead.  He worked in the Barclays office located at 1301 Avenue of the Americas, New York, NY 10019.  Barclays is in the business of investment banking and provides large corporate, government and institutional clients with solutions to their financing and risk management needs.  As a TFM.Net Development Lead, Mr. Lang's job duties were to build IT solutions for tax regulations within the Global Client Lifecycle IT organization.  His core responsibilities were to architect, design and develop interface and layout functionality with other data systems.

31.     During Mr. Lang's interview process, Sandeep Jain, Vice President IB – Client Lifecycle and Tax Due Diligence Technology, told him that he would be working in a climate that was technologically advanced and supportive.

32.     As soon as he began working and reporting to Kenneth Kollar, VP at Barclays Capital, Inc., it became clear to Mr. Lang that the office climate was competitive and that his coworkers were not forthcoming with information.  Most of Mr. Lang's non-technical team members spoke only in domain or departmental jargon, and it was very difficult to have any type of communication with them.  Mr. Lang heard from a supervising manager that Mr. Kollar had been hired to replace Mr. Jain in order to implement more structure into what had become a chaotic department.

33.      Mr. Kollar told Mr. Lang that he had been ambivalent about his hire, but he praised Mr. Lang's analytical thought process and his ability to communicate clearly.

34.      Mr. Lang was hired to replace lead developer Ikbal Rahmoon. The transition and transfer of information was very strained because Mr. Rahmoon made it clear to Mr. Lang that his departure was not voluntary. Mr. Rahmoon sped through each transition session, providing very little detail or explanation.  However, Mr. Rahmoon provided Mr. Kollar with an itemized list of what they had discussed in order to make it appear as if he had effectively transferred the necessary information to Mr. Lang.

35.      From the time he began working at Barclays, Mr. Lang was met with resistance and hostility from Mr. Rahmoon and his other coworkers, Rajiv Krishnamurthy, Giacinto "George" Ferrari and Harsh Oza. They held Mr. Lang in contempt because unlike them, he did not have a background in tax documentation. On his first day of work, Mr. Krishnamurthy asked Mr. Lang about his tax documentation background. Mr. Lang told him that he did not have this type of background. Mr. Krishnamurthy, who considered himself an expert, was routinely condescending toward Mr. Lang when he did not know specific tax documentation information. George Ferrari, too, routinely admonished Mr. Lang when he was unfamiliar with the steps he needed to follow in order to accomplish a task.

36.      Mr. Lang sat directly across from Mr. Ferrari, who was extremely belligerent and confrontational toward him.  At one point during Mr. Lang's employment, he reported this hostile work environment to Sara Rosinus, in Human Resources. Ms. Rosinus told him that a Barclay manager is entitled to manage as they please, and that it was Mr. Lang's right to seek other employment.

37.      However, Mr. Lang successfully collaborated with the team of developers that he led in

Pune, India.  Mr. Lang had a relationship of mutual support and respect with these colleagues.

38.    On or about July 16, 2015, Mr. Lang received his mid-year performance review.  The comments in his review were extremely contradictory. The negative comments about Mr. Lang's alleged adversarial and disrespectful approach toward co-workers were based on interactions with his hostile coworkers.  Mr. Lang's efforts to clarify communications with his colleagues were invariably interpreted as evidence of his lack of respect or deference to their technical knowledge.  He was not apprised of any method to go about refuting the inaccurate and unfair comments, so he did not draft an objection. He began to worry that he would be fired for not having tax documentation domain knowledge, a fact of which Barclays was aware when they hired him.

39.    During this review, however, Mr. Lang was acknowledged for creating and engendering activity transparency and pride of ownership within the Pune, India development team. Mr. Kollar later sent Mr. Lang an email congratulating him on performing well with the development team. In addition, Mr. Kollar added, "I want to specifically acknowledge that of his own initiative, George probably puts in more time than anyone else on the team.  This speaks volumes about his dedication and determination."

40.    During his tenure at Barclay's, in weekly one on one and ad hoc meetings with Mr. Kollar, Mr. Lang was only occasionally acknowledged for his successes. More frequently, he was admonished for not following some unwritten or unidentified procedure. Mr. Kollar routinely reprimanded Mr. Lang for not following company procedures that had never been explained to him.

41.    Mr. Kollar habitually pointed out the difficulty he had in understanding Mr. Lang's thought process in accomplishing tasks. In addition, Mr. Kollar frequently complained about Mr.

7

Lang's way of describing and explaining things. Specifically, he took issue with Mr. Lang's alleged reluctance to embrace domain jargon, in preference for using easily understandable language and descriptions.  He suggested to Mr. Lang that his communication style was not normal, and that he could not understand how he spoke.  Mr. Kollar regarded Mr. Lang as disabled and unable to communicate appropriately. On several occasions, Mr. Kollar asked Mr. Lang if he was "drunk or high."

42.    On or about September 15, 2015, Mr. Lang received an acknowledgment from Barclays for a major application performance enhancement he had completed.

43.    At the beginning of 2016, Mr. Lang received his 2016 performance objectives.  One of these objectives was to have an effective knowledge transfer with his coworker, George Ferrari. On information and belief, Mr. Ferrari interpreted Mr. Lang's attempts to communicate and share knowledge as threatening to his role at Barclays and undermining to his credibility. Mr. Ferrari consistently dismissed Mr. Lang's attempts to communicate, and Mr. Kollar had to intervene as a referee.

44.    In or about April 2016, Mr. Lang discovered some glaring oversights in the production configuration for the web application which he supported (TFM). Since it was Mr. Lang's responsibility to deliver application performance improvements, he brought this issue to the attention of Mr. Ferrari, who was responsible for production deployments. Mr. Ferrari did not like the fact that Mr. Lang had discovered his oversights, and became hostile towards him. Mr. Ferrari reported this interaction to Mr. Kollar as undermining to his credibility. Mr. Kollar confronted Mr. Lang and chastised him for the way he handled the interaction. Mr. Ferrari was not reprimanded in any way for his role in the dispute.  Mr. Lang was treated differently than similarly situated employees who were not regarded as disabled.

45.     On or about, mid to late March, 2016, Mr. Lang contacted Danielle Treacy of Barclays

Employee Relations about his conflict with Mr. Ferrari, in the hope of preventing an escalation.

Because Ms. Treacy recorded their conversation, Mr. Lang was nervous and hesitant to proceed.

He told her about the meeting that had taken place with Mr. Ferrari, Mr. Kollar and himself,

during which Mr. Ferrari accused Mr. Lang of undermining him.  Mr. Lang told her that he had

denied this allegation and had expressed his desire to move on with a better working relationship.

Mr. Lang then told Ms. Treacy that Mr. Ferrari's resistance and hostility was preventing him

from to do his job effectively. He also told her that Mr. Kollar treated him differently than Mr.

Ferrari because he did not like Mr. Lang's communication style. On information and belief, Mr.

Ferrari was not warned or disciplined in regard to any of the hostile interactions between himself

and Mr. Lang.

46.     In or about May 2015, as the result of a personal dispute, Mr. Lang's ex-girlfriend hacked

into his computer and forwarded damaging emails to Mr. Kollar.

47.     On or about May 2, 2016, Ms. Treacy called Mr. Lang into a meeting and asked him to

participate in the Employee Assistance Program which would require him to take a leave  of

absence.  Nothing was explained to him regarding the Employee Assistance Program ("EAP"),

and Mr. Lang was not told why he was required to take part in the program.  Ms. Treacy told him

only that emails from his Outlook account had been forwarded to his manager, Mr. Kollar.  Mr.

Lang later found out that the emails consisted of private conversations between himself and his

sister about some of his co-workers' behavior towards him, and how he was struggling in the

hostile work environment. There were also email exchanges between Mr. Lang and employment

head hunters.  Mr. Lang was told to set up an appointment with Dr. Goldsmith at the EAP to

obtain a fitness assessment in order to return to work.  Mr. Lang was never given a reason why

he was put on a leave of absence. At the end of the meeting, Ms. Treacy asked Mr. Lang to

return his badge and to leave the building.

48.     On or about May 9 and 10, 2016, Mr. Lang meet with Dr. Eric Goldsmith for a fitness for

duty evaluation.  Mr. Lang passed this evaluation.

49.     On or about May 11, 2016, Dr. Goldsmith wrote a letter to Ms. Treacy in which he

reported the results of Mr. Lang's evaluation.  He wrote that in his opinion, "to a   reasonable

degree of psychiatric certainty...George Lang's current psychiatric condition is such that he is fit

for full time duty. I find no evidence of a major psychiatric condition or substance abuse

problem."  Mr. Lang was released to go back to work without restriction. Ms. Treacy received

this report on or about May 11, 2016.

50.     On or about May 16, 2016, Mr. Lang returned to work after a two-week paid leave of

absence.  That day, he was asked to attend a meeting with Human Resources representative Sara

Rosinus and Mr. Kollar.  At this meeting, Mr. Kollar gave Mr. Lang a written warning with a

bulleted list of items.  As Mr. Kollar went through the list, Mr. Lang verbally objected to the

list's assertions. The list contained accusations against Mr. Lang including lack of attention to

detail, inadequate interactions with non-development peers, criticism of intermediary

design analysis, and improper coding change delivered to production.

51.     During this meeting, Mr. Lang responded to the accusations by telling Mr. Kollar that he

had always interacted with development peers in a professional manner, and that he had   in fact

been commended for his collaborative efforts and the resulting improvements in efficiency.

However, he told Mr. Kollar, any attempts at communication with his non-development peers

had been met with resistance and hostility.

52.     Also during this meeting, Mr. Lang told Mr. Kollar that whenever he had been given last

minute work requests, he had consistently accepted and performed them without complaint, and without requiring extra instruction. Mr. Lang let him know that he was interested in making his team functional and he felt as if he was succeeding in this goal.

53.     During this meeting, Mr. Lang also told Mr. Kollar that the criticism of his intermediary design analysis was unwarranted and unjust because the direction he had received was muddled and unclear.

54.     At this meeting, Mr. Lang went on to tell Mr. Kollar that the coding change he had delivered to production was completely accurate. Mr. Lang pointed out that Mr. Kollar had provided him with inconsistent reviews of his performance, at times commending him and at other times admonishing him for his performance of the same task.

55.     Also during this meeting, Mr. Kollar criticized Mr. Lang's method of communication. He was told that he needed to conform to his coworkers' methods of communication. Mr. Kollar reminded Mr. Lang that both he and Mr. Ferrari had mentioned to him that he phrased his ideas and instruction in a "distinct" and "unique" way.  They wanted him to conform to their way of speaking as an area of improvement. Mr. Lang objected to his communication style as a category that needed improvement, and he told Mr. Kollar that this was the only way he knew how to communicate.  Barclays clearly regarded Mr. Lang as disabled.

56.     On or about July 19, 2016, Mr. Lang received notification of the termination of his employment at Barclays.  He was called to a meeting with Mr. Kollar and Ms. Rosinus. Mr. Kollar started the meeting off by listing areas of Mr. Lang's performance in which he saw no sign of improvement.  He refused to provide Mr. Lang with the written list.  Mr. Lang objected to the reasons he was given for his termination, and said that he thought he should be given the opportunity to improve his performance. Ms. Rosinus then gave Mr. Lang a proposed severance

package, but Mr. Lang did not sign it.  Mr. Kollar escorted him to his desk to retrieve his belongings.

57.     Mr. Lang was discriminated against because and substantially because Barclays regarded him as having a mental disability. Barclays retaliated against Mr. Lang for refusing to conform his communication style to that of his coworkers who were not regarded as disabled.

## IV.     COUNT ONE:          DECLARATION JUDGMENT THAT EMPLOYMENT AGREEMENT IS UNENFORCEABLE

58.     Plaintiff hereby repeats and realleges paragraphs 1 to 57 as if fully pleaded herein.

59.     Plaintiff asserts a judicial dispute exists as a result of the December 10, 2014 offer letter and Defendant's August 3, 2017, attempt to enforce the arbitration paragraph titled, "Agreement to Arbitrate Employment Dispute." (Exhibit B, p.3). Thus, there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations between the parties which requires the Court's intervention to settle the matter before litigation commences.

60.     Plaintiff seeks a declaratory judgment pursuant to Fed. R. Civ. Pro. 57 and 28 U.S.C. §2201, as he has legal and equitable interest by reason of Defendant's threat of enforcing the arbitration paragraph titled, "Agreement to Arbitrate Employment Dispute."

61.     There exists a complete uncertainty as to Plaintiff's rights with respect to the non-enforceability of the purported arbitration paragraph and his jural relations with Defendant.

62.     Plaintiff asserts that this Court respectfully must adjudicate the non-enforceability and validity of the purported arbitration paragraph, regardless of the Defendant's defenses, if any. There is no other form of proceeding by which Plaintiff can initiate to obtain immediate redress.

63.     The purported arbitration paragraph is void because it violates public policy in the State of New York and at the federal level. Enforcing the vague and ambiguous language of the

arbitration paragraph will deprive Plaintiff of his Seventh Amendment right to a jury trial. The arbitration paragraph is void of any language regarding waiver of a jury trial. Defendant completely failed to put Plaintiff on notice of his waiver.

64.      The purported arbitration paragraph is not legally enforceable.

## V.       COUNT TWO:       BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

65.      Plaintiff hereby repeats and realleges paragraphs 1 to 64 as if fully pleaded herein.

66.      Plaintiff entered into an employment relationship with the Defendant in which Plaintiff was required to accept the terms of his offer letter and was not given an opportunity to negotiate its terms. Plaintiff reasonably expected to be treated fairly in the terms and conditions of his employment, including after the employment relationship ended.

67.      Defendant has acted in bad faith by knowingly and intentionally implementing and attempting to enforce an arbitration paragraph that is vague, ambiguous, and obviously fails to include the any language placing Plaintiff on notice that he was waiving his Seventh Amendment right to a jury trial. Defendant knew this arbitration paragraph was unenforceable against Plaintiff as a matter of law, and attempted to enforce its terms against Plaintiff.

68.      The Defendant should be held liable to Plaintiff on this count and he should be awarded all appropriate relief including reasonable attorneys' fees for bringing this action.

## VI.       COUNT THREE:  PERCEIVED AS DISABLED DICRIMINATION IN VIOLATION OF THE ADA

69.      Plaintiff hereby repeats and realleges paragraphs 1 to 68 as if fully pleaded herein.

70.      Plaintiff was always qualified for his position with or without accommodation.

71.      Plaintiff was discriminated against by Defendant because he was perceived as mentally

13

disabled.

72.     On information and belief, Defendant concluded that Plaintiff's perceived disability interfered with a major life activity.  The major life activity was working and speaking or verbal communication.

73.     Plaintiff is not mentally disabled.

74.     Plaintiff has no history of mental disability or impairment.

75.     Defendant perceived Plaintiff was mentally disabled when Plaintiff's supervisor, Ken Kollar and his coworker, George Ferrari, criticized him for his unusual communication style.

76.     Defendant perceived Plaintiff was mentally disabled when Defendant accused Plaintiff of using language that was confusing to his colleagues, and told him that he needed to conform to their communication style.

77.     Defendant perceived Plaintiff to be mentally disabled and there is a record of Plaintiff's perceived disability. On May 2, 2016, because Plaintiff was perceived as mentally disabled, Defendant forced Plaintiff to enter Barclay's Employee Assistance Program (EAP) and to undergo a psychiatric evaluation to determine his fitness to work. While Plaintiff awaited his psychological evaluation, he was placed on a paid leave of absence and told not to return to work until he was released by the doctor. On May 9 and 10, 2016, Dr. Goldsmith performed a comprehensive psychiatric assessment of Plaintiff and determined that "Mr. Lang's current psychiatric condition is such that he is fit for full time duty."

78.     On May 16, 2016, the same day that Plaintiff retuned to work, he was given a written disciplinary action.  Barclays continued to regard him as disabled and treated him differently than similarly situated non-disabled employees, even after the doctor found him fit to work.

79.     On July 19, 2016, two months after his leave of absence, Plaintiff was unlawfully

14

terminated because he was regarded as disabled.

80.     Defendants should be held liable on this count and Mr. Lang should be awarded all appropriate relief.

## VII.     COUNT FOUR:  PERCEIVED AS DISABLED DICRIMINATION IN VIOLATION OF THE NYHRL

81.     Plaintiff hereby repeats and realleges paragraphs 1 to 80 as if fully pleaded herein.

82.     Plaintiff was always qualified for his position with or without accommodation.

83.     Plaintiff was discriminated against by Defendant because he was perceived as mentally disabled.

84.     On information and belief, Defendant concluded that Plaintiff's perceived mental disability or impairment substantially limited Plaintiff's normal activities.  The normal activity was working and speaking or verbal communication.

85.     Plaintiff is not mentally disabled.

86.     Plaintiff has no history of mental disability or impairment.

87.     Defendant perceived Plaintiff was mentally disabled when Plaintiff's supervisor, Ken Kollar, and his coworker, George Ferrari, criticized him for his unusual communication style.

88.     Defendant perceived Plaintiff was mentally disabled when Defendant accused Plaintiff of using language that was confusing to his colleagues, and told him that he needed to conform to their communication style.

89.     Defendant perceived Plaintiff to be mentally disabled. There is a record of Plaintiff's perceived disability. On May 2, 2016, because Plaintiff was perceived as mentally disabled, Plaintiff was forced to enter Barclay's Employee Assistance Program (EAP) and to undergo a psychiatric evaluation to determine his fitness to work. While Plaintiff awaited his psychological

15

evaluation, he was placed on a paid leave of absence and told not to return to work until he was released by the doctor. On May 9 and 10, 2016, Dr. Goldsmith performed a comprehensive psychiatric assessment of Plaintiff and determined that "Mr. Lang's current psychiatric condition is such that he is fit for full time duty."

90.     On May 16, 2016, the same day that Plaintiff retuned to work, he was given a written disciplinary action.  Barclays continued to regard him as disabled and treated him differently than similarly situated non-disabled employees, even after the doctor found him fit to work.

91.     On July 17, 2016, two months after his leave of absence, Plaintiff was unlawfully terminated because he was regarded as disabled.

92.     Defendants should be held liable on this count and Mr. Lang should be awarded all appropriate relief.

## VIII.   COUNT FIVE:  HOSTILE ENVIRONMENT RELATED TO PERCEVEID AS DISABLED DISCRIMINATION IN VIOLATION OF ADA

93.     Plaintiff hereby repeats and realleges paragraphs 1 to 92 as if fully pleaded herein.

94.     Plaintiff suffered a severe and pervasive work environment because he was perceived as disabled.

95.     The hostile work environment was so pervasive that it interfered with Plaintiff's ability to do work.

96.     Plaintiff felt that he was being treated in a hostile manner by Defendant because Plaintiff's co-workers and superiors perceived him as mentally disabled.

97.     Plaintiff's supervisor, Mr. Kollar, frequently chastised Plaintiff in front of other employees for his communication style.

98.     Mr. Kollar routinely reprimanded Plaintiff for not following company procedures that

had never been explained to him.

99.     Mr. Kollar habitually pointed out in front of other employees, that he had difficulty understanding Plaintiff's thought process in accomplishing tasks. This was intended to humiliate and belittle Plaintiff.  This hostile act did humiliated Plaintiff.

100.    Mr. Kollar frequently complained to plaintiff and other employees about Plaintiff's way of describing and explaining things. Specifically, he took issue with Plaintiff's reluctance to embrace domain jargon, in preference for using easily understandable language and descriptions.

101.    On several occasions, Mr. Kollar suggested to Plaintiff that his communication style was not normal, and that he could not understand how he spoke.

102.    Mr. Kollar regarded Plaintiff as mentally disabled and unable to communicate appropriately.

103.    On several occasions, Mr. Kollar, maliciously asked Plaintiff in front of other employees if he was "drunk or high."

104.    Mr. Ferrari, Plaintiff's co-worker, intentionally frustrated and ridiculed Plaintiff on a regular basis to cause him to lose his temper in reaction.  Mr. Ferrari intentionally made hostile comments to Plaintiff to antagonize Plaintiff to the point where Plaintiff would get upset. Defendant condoned Mr. Ferrari's behavior.

105.    Plaintiff reported Mr. Ferrari's hostile acts and ongoing and intentional antagonistic interactions to his supervisor, Mr. Kollar and to Human Resources.  No remedial action was taken against Mr. Ferrari.  Instead, Defendant required Plaintiff to participate in an Employee Assistance Program (EAP) that included a two-week paid leave of absence.

106.    Defendant did not tell Plaintiff why it required him to participate in the EAP.  This was a hostile act.

17

107.    After Plaintiff was cleared by a doctor as mentally stable and fit to work, Plaintiff

returned to work where he was disciplined upon arrival and then terminated two months later.

108.    Plaintiff was subject to a hostile work environment, in violation of the ADA when he was

discriminated against for being regarded as mentally disabled. Plaintiff complained to his

superior about the hostility and his complaints were ignored and instead, he was disciplined and

suffered an adverse employment action for complaining.

109.    Defendants should be held liable on this count and Plaintiff should be awarded all

appropriate relief.

## IX.     COUNT SIX:  HOSTILE ENVIRONMENT PURSUANT TO NYHRL

110.    Plaintiff hereby repeats and realleges paragraphs 1 to 109 as if fully pleaded herein.

111.    Plaintiff suffered a severe and pervasive work environment because he was perceived as

disabled.

112.    The hostile work environment was so pervasive that it interfered with Plaintiff's ability to

do work.

113.    Plaintiff felt that he was being treated in a hostile manner by Defendant because

Plaintiff's co-workers and superiors perceived him as mentally disabled.

114.    Plaintiff's supervisor, Mr. Kollar, frequently chastised Plaintiff in front of other

employees for his communication style.

115.    Mr. Kollar routinely reprimanded Mr. Lang for not following company procedures that

had never been explained to him.

116.    Mr. Kollar habitually pointed out in front of other employees, that he had difficulty

understanding Plaintiff's thought process in accomplishing tasks. This was intended to humiliate

and belittle Plaintiff.  This hostile act did humiliated Plaintiff.

18

117.    Mr. Kollar frequently complained to plaintiff and other employees about Plaintiff's way of describing and explaining things. Specifically, he took issue with Plaintiff's reluctance to embrace domain jargon, in preference for using easily understandable language and descriptions.

118.    On several occasions, Mr. Kollar suggested to Plaintiff that his communication style was not normal, and that he could not understand how he spoke.

119.    Mr. Kollar regarded Mr. Plaintiff as mentally disabled and unable to communicate appropriately.

120.    On several occasions, Mr. Kollar, maliciously asked Plaintiff in front of other employees if he was "drunk or high."

121.    Mr. Ferrari, Plaintiff's co-worker, intentionally frustrated and ridiculed Plaintiff on a regular basis to cause him to lose his temper in reaction.  Mr. Ferrari intentionally made hostile comments to Plaintiff to antagonize Plaintiff to the point where Plaintiff would get upset. Defendant condoned Mr. Ferrari's behavior.

122.    Plaintiff reported Mr. Ferrari's hostile acts and ongoing and intentional antagonistic interactions to his supervisor, Mr. Kollar and to Human Resources.  No remedial action was taken against Mr. Ferrari.  Instead, Defendant required Plaintiff to participate in an Employee Assistance Program (EAP) that included a two-week paid leave of absence.

123.    Defendant did not tell Plaintiff why it required him to participate in the EAP.  This was a hostile act.

124.    After Plaintiff was cleared by a doctor as mentally stable and fit to work, Plaintiff returned to work where he was disciplined upon arrival and then terminated two months later.

125.    Plaintiff was subject to a hostile work environment, in violation of the ADA when he was discriminated against for being regarded as mentally disabled. Plaintiff complained to his

19

superior about the hostility and his complaints were ignored and instead, he was disciplined and suffered an adverse employment action for complaining.

126.    Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## X.    COUNT SEVEN:    PERVCEVIED AS DISABLED RETALIATION IN VIOLATION OF ADA

127.    Plaintiff hereby repeats and realleges paragraphs 1 to 126 as if fully pleaded herein.

128.    Defendant's conduct, by and through its agents, in retaliating against Plaintiff denied Plaintiff equal treatment on the basis of his protected activities in violation of 42 U.S.C. § 12101 et.seq. ("ADA").

129.    Defendant, in failing to adequately investigate and remedy the treatment to which Plaintiff was subjected to, despite the Defendant's knowledge of the conduct, discriminatorily denied Plaintiff equal treatment on the basis of protected activities in violation of 42 U.S.C. § 12101 et.seq.

130.    Moreover, once Plaintiff discovered and witnessed the discriminatory actions by the Defendant and its employees, he immediately protested such discrimination. The Defendant then retaliated against Plaintiff, adversely altering his terms, conditions and privileges of employment, terminating his employment. Defendant's retaliatory conduct violated 42 U.S.C. § 12101 et.seq.

131.    The retaliatory acts of the Defendant as described above were intentional, willful and were motivated on the basis of Plaintiff's protected activity.

132.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

133.    The Defendant should be held liable on this count and Plaintiff should be awarded all

appropriate relief.

## XI.   COUNT EIGHT:   PERCEVIED AS DISABLED RETALIATION IN VIOLATION OF NYHRL

134.    Plaintiff hereby repeats and realleges paragraphs 1 to 133 as if fully pleaded herein.

135.    Defendant's conduct, by and through its agents, in retaliating against Plaintiff denied Plaintiff equal treatment on the basis of his protected activities in violation of New York Human Rights Law.

136.    Defendant, in failing to adequately investigate and remedy the treatment to which Plaintiff was subjected to, despite the Defendant's knowledge of the conduct, discriminatorily denied Plaintiff equal treatment on the basis of protected activities in violation of New York Human Rights Law.

137.    Moreover, once Plaintiff discovered and witnessed the discriminatory actions by the Defendant and its employees, he immediately protested such discrimination. The Defendant then retaliated against Plaintiff, adversely altering his terms, conditions and privileges of employment, terminating his employment. Defendant's retaliatory conduct violated New York Human Rights Law.

138.    The retaliatory acts of the Defendant as described above were intentional, willful and were motivated on the basis of Plaintiff's protected activity.

139.    As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

140.    The Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**XII.   DEMAND FOR RELIED**

George Lang hereby requests the following relief:

A.  Declare that the arbitration paragraph is void and unenforceable as a matter of law;

B.  Award compensatory damages;

C.  Award punitive damages;

D.  Award attorneys' fees and costs;

E.  Award pre-judgement interest;

F.  Award post-judgement interest;

G.  Declare that the arbitration clause in the Agreement is unenforceable as a matter of
    law;

H.  Award such other relief in law or equity as this Court deems appropriate.

## <u>JURY TRIAL DEMANDED</u>

 Plaintiff respectfully requests a jury trial on all questions of fact raised by his Complaint.


                              Respectfully Submitted,
                              PLAINTIFF
                              George Lang


                              By:_____/s/_____
                              Mark P. Carey (MC6798)
                              Kirsten M. Schneider (KS0033)
                              Mark P. Carey, P.C.
                              71 Old Post Road, Suite One
                              Southport, CT 06890
                              (203) 255-4150 tel
                              (203) 255-0380 fax
                              mcarey@capclaw.com

                              HIS ATTORNEY

22

# EXHIBIT A

EEOC Form 161-B (11/09)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("EEOC")

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | From: |
|---|---|
| **George Lang**<br>**300 Communipaw Avenue**<br>**Jersey City, NJ 07304** | **New York District Office**<br>**33 Whitehall Street, 5th Floor**<br>**New York, NY 10004** |

☐ On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2017-01362** | **Patrick Sanford, Federal Investigator** | **(212) 336-3677** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered Charge of Discrimination ("Charge"). It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this Charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this Charge.

☐ Less than 180 days have passed since the filing of this Charge, but I have determined that it is unlikely that the EEOC will be able to complete its investigation of this Charge within 180 days from the filing of this Charge.

[X] The EEOC is terminating its investigation of this Charge.

☐ The EEOC will continue to investigate this Charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the Charge was filed until 90 days after you receive notice that we have completed action on the Charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing its investigation of this Charge. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your Right to Sue based on the above-numbered Charge will be lost.

☐ The EEOC is continuing its investigation of your ADEA case. However, if **60 days** have passed since the filing of this Charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the Right to Sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this Charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Kevin J. Berry,*
**Kevin J. Berry,**
**District Director**

JUL 2 6 2017

*(Date Mailed)*

Enclosures(s)

cc: | **Respondent:**<br>Barclay's Services Corp.<br>745 Seventh Avenue<br>New York, NY 10019 | **Respondent's Attorney:**<br>Karmer, Levin, Naftalis & Frankel<br>Attn: Katrina Baker, Esq.<br>1177 Avenue of the Americas<br>New York, NY 10036-2714<br>(212) 715-9233 | **Charging Party's Attorney:**<br>Mark P. Carey, P.C.<br>Attn: Jill Saluck, Esq.<br>71 Old Post Road – Suite One<br>Southport, CT 06890<br>(203) 255-4150 |

# EXHIBIT B



200 Park Avenue
New York NY 10166
USA

Tel +1 (212) 412 4000

December 10, 2014

George Lang
300 Communipaw Avenue
Apt. #20
Jersey City, NJ 07304

Dear George:

It is with great pleasure that we extend to you an offer to join Barclays as an Assistant Vice President in the Global Technology Department.  Your employment will be with Barclays Services Corp. or such other entities within the Barclays Group as may be designated by the Company from time to time ("Barclays" or the "Company").  The details of your employment are as follows:

Start Date:  Your anticipated start date is to be determined upon mutual agreement.

Compensation

Base Salary:  Your base salary will be paid at the annual rate of $135,000.  Currently, salaries are paid semi-monthly on the last work day of each of the two monthly pay periods, which end on the 15th and the last day of every month.

Discretionary Incentive Award:

The Company operates a discretionary incentive awards scheme for employees where the value, form, conditions and timing are entirely at the Company's discretion.  This discretion includes the right to decline to make discretionary incentive awards, to make the award or a proportion of the award in a form other than cash (including as an award of Barclays PLC shares) and to award an element of the award under the terms of a Barclays incentive plan.

The performance year in respect of discretionary incentive awards runs from 1 January to 31 December.  Only employees who are in Active Working Status on 31 October may be considered for participation in the discretionary incentive awards scheme for that performance year, provided that such employees remain in Active Working Status when the discretionary incentive award is made.

The level of any discretionary incentive awards will depend upon individual, team and Company performance and your adherence with the Company's values, policies and employee standards.

Discretionary incentive awards are normally communicated in the first quarter following the end of the performance year. Delivery of any discretionary incentive awards is subject to you being in Active Working Status on the delivery date.

The Company reserves the right to decline to make discretionary incentive awards at its absolute discretion or change the timing and/or nature of its discretionary incentive awards scheme at any time.

"Active Working Status" as used in this letter means that you have not resigned (or given notice of your resignation) and have not been terminated (or been given notice of your termination).

<u>Separation from the Company</u>:  If you resign or your employment otherwise ends for any reason, your fixed compensation will end on the last day of your employment, and you will not be entitled to any bonus or other incentive awards, whether in stock or cash, or any other payments referred to in this letter.

<u>Cause</u>:  For purposes of this letter, "Cause" means: (i) violation of any federal, state or local securities or banking laws, rules or regulations; (ii) violation of any rules or regulations of any regulatory or self-regulatory organization; (iii) violation of any Barclays policy or procedure (including, but not limited to, a breach of risk or compliance standards such as, but not limited to, the Anti-Bribery and Anti-Corruption Policy and Procedures); (iv) criminal conduct which could either result in your statutory disqualification or could reasonably result in harm to Barclays or to its reputation; (v) suspension, bar or limitation on your activities for Barclays by any regulatory or self-regulatory organization; (vi) violation of Barclays policy against discrimination, harassment or retaliation; (vii) failure to maintain your license(s) and required registration(s) in good standing; (viii) engaging in breach of fiduciary duty, gross negligence or willful misconduct in connection with your employment; (ix) engaging in a conflict of interest or self-dealing; (x) commission of an act of fraud, dishonesty or misrepresentation; (xi) refusal or failure to comply with Barclays' reasonable directions or procedures or to perform your employment duties; (xii) material breach of your obligations in this offer letter or any of the accompanying attachments; or (xiii) making a factual representation in connection with your hiring that was untrue in any material respect when made or omitting or failing to disclose a material fact in connection with your hiring.

<u>Notice Period</u>:  You or the Company may end your employment relationship by giving not less than one month's prior written notice of termination of employment to the other.   During your notice period, the Company may elect to place you on paid leave for all or any part of the notice period.  In the case of your resignation, your notice period may be shortened or waived entirely at the Firm's discretion without any fixed compensation due past the last day of employment.  In cases of Cause, your employment may be terminated by the Company without notice.  During your notice period, your fixed compensation and benefits will continue, but you will not be eligible for bonus or other incentive payments or any share awards or other long term awards.  Your manager will determine whether you will be required to report to work and what your continuing job responsibilities will be, if any, during your notice period.  During this time, you will remain an employee of the Company.  This means that you must continue to comply with all Company policies and that you may not perform any services for another firm or otherwise act in another firm's interest.

<u>Post-Employment Obligations</u>:  During your employment (including any Notice Period) and for a period of three months thereafter, you agree that you will not on your own behalf or on behalf of any person, firm, company or business entity, directly or indirectly, induce, solicit, entice or endeavour to induce, solicit or entice any employee of Barclays, or any of its affiliates, to terminate his or her employment relationship with Barclays, or its affiliate.

You further agree that, during your employment (including any Notice Period) and for a period of three months thereafter, you will not on your own behalf or on behalf of any person, firm, company or business entity, directly or indirectly, induce, solicit, entice or endeavour to induce, solicit or entice any Restricted Client to do business with any other person, firm, company or business entity that competes with Barclays or its affiliates, or to terminate or modify its business relationship with Barclays or its affiliates.

"Restricted Client" means any person, firm or company with whom you or Barclays' employees under your direct or indirect supervision had business dealings during your employment or who you gained knowledge of through your employment with Barclays, and who, on the final day of your employment or at any time during the preceding twelve months, was a client or customer of a member of the Barclays Group in respect of the businesses of Barclays (and any successor or associated business units) with which you were involved during your employment.

If requested, you must sign an affidavit concerning your compliance with these obligations.

<u>Remedies</u>:  You acknowledge that if you breach any of your Post-Employment Obligations, or your notice or confidentiality obligations to the Company, Barclays will suffer immediate and irreparable harm and that monetary damages will not be an adequate remedy.  Therefore, you agree and consent that Barclays may obtain and enforce an

injunction to the extent allowed by applicable law, prohibiting you from violating or threatening to violate such provisions. This is not Barclays' only remedy; it is in addition to any other remedy available.

<u>Agreement to Arbitrate Employment Disputes</u>: You and Barclays mutually agree that any dispute or controversy arising under or in connection with your employment, including any dispute regarding your compensation or the termination of your employment or any dispute arising under any contract of employment, shall be settled on an individual basis by arbitration before FINRA, in accordance with its rules as then in effect, and any award or judgment therein may be entered in any court in New York, New York having jurisdiction. This Arbitration Agreement applies to, but is not limited to, any and all claims arising under any federal, state or municipal discrimination, wage payment or fair employment practices law, statute, or regulation, or under common law. For the avoidance of doubt, if controlling legislation (such as the Dodd-Frank Wall Street Reform and Consumer Protection Act) prohibits mandatory arbitration of claims arising under such legislation, such claim may be brought, at your election, either through arbitration or through such other avenues as permitted by law.

<u>Waiver of Participation in Class or Collective Claims</u>: You agree that, to the greatest extent permitted by applicable law, no arbitrator shall have the power to consider class or collective claims or grant relief other than on an individual basis. You waive the right to bring, or participate in, any collective, representative or class action legal proceeding concerning your employment with Barclays. If requested, you will provide a notice of election declining to participate in a class action or putative class action, pursuant to FINRA Rule 13204(d) or any successor rule. For the avoidance of doubt, if a court determines that you cannot waive your right to bring or participate in a class, collective or representative action pursuant to this Agreement, any such claim may only be brought in court and not through arbitration.

<u>Policies</u>: The terms and conditions of your employment are governed by Barclays' standard policies and procedures (as adopted and amended from time to time), including those contained in the Employee Handbook, the Code of Conduct and those promulgated by the Compliance department (such policies include, but are not limited to, the Whistleblowing Policy, the Anti-Bribery and Anti-Corruption Policy and Procedures, the Anti-Money Laundering/Counter-Terrorist Financing Policy and the Outside Affiliations and Outside Investments Policy.) You must acquaint yourself with all such standard policies and comply with them during your employment. In addition, as a condition of this offer and your employment with Barclays, you will be required to execute and comply with the terms of Barclays' Confidentiality and Intellectual Property Agreement (a copy of which is enclosed). Failure to comply with all such policies, procedures, and agreements will be grounds for disciplinary action by Barclays, up to and including termination for Cause.

<u>At Will</u>: Your employment with Barclays is "at will" and not for any fixed term. This means that you may resign at any time, for any reason or for no reason, subject to the Notice Period set forth above. Similarly, Barclays may terminate your employment at any time, for any reason or for no reason, with or without cause, subject only to the Notice Period set forth above.

<u>Entire Agreement/Amendment</u>: This offer letter, along with the Confidentiality and Intellectual Property Agreement, contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all proposals or prior agreements, oral or written. The terms of this offer letter and the Confidentiality and Intellectual Property Agreement may not be amended or waived, other than in a writing signed by you and Barclays that expressly refers to the terms being amended or waived.

<u>Governing Law</u>: This offer letter (and the Confidentiality and Intellectual Property Agreement) will be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws.

<u>Taxes</u>: All payments described in this letter will be made in accordance with Barclays' regular payroll practices, and will be less tax withholding and other applicable deductions. Any release of shares will be subject to applicable taxes, which may be covered through the sale of shares on your behalf.

<u>Non-Disclosure</u>: Except to the extent required by law or legal process, you agree that you will not, without Barclays' express written consent, disclose your compensation information to anyone within Barclays other than to your

manager(s) and individuals in human resources, or to persons outside Barclays other than to family members, attorneys, accountants, financial advisors, or other consultants or agents who deal with compensation matters.

Representations:  In making this offer of employment, Barclays has relied on your representations that you are not subject to any contract, duty or obligation that would in any way prevent you from becoming employed with us on your start date or otherwise interfere with your ability to work for us.  If you are subject to any contract, duty or obligation (including any non-competition, non-solicitation, or other restrictive covenant with any former employer) that might in any way affect your employment by Barclays as contemplated by this letter, this offer is contingent upon your disclosing any such restriction prior to your start date (and, if consistent with your obligations to your former employer, providing a copy of any relevant contract) for Barclays to consider and to determine whether to proceed with the employment.

Further, you represent and warrant that:  (a) you are not and have not been criminally convicted of an offense involving elements of dishonesty (such as theft or fraud) or elements of anti-competitive behavior; and (b) to your knowledge, you are not and have not been the subject of a non-criminal investigation by any company or body wherein you were suspected of engaging in materially dishonest behavior (such as theft or fraud), or wherein you were suspected of engaging in bribery or a corrupt act.  For the purposes of sub-part "b", you need not make any representation or warranty concerning non-criminal investigations in which it was concluded that you did not engage wrongful behavior.  If, however, you are aware of a relevant investigation where either (i) it was concluded that your conduct was found to have been wrongful; or (ii) there was no conclusion because your employment (or engagement) with the relevant company or body was terminated during the investigation for any reason (including your voluntary termination or some mutual agreement), you must disclose such relevant investigation(s) prior to accepting this offer of employment.  Likewise, you must disclose any criminal convictions involving elements of dishonesty or anti-competitive behavior.

For the purposes of the foregoing, "bribery" shall be construed broadly, in accordance with the United Kingdom Anti-Bribery Act of 2010.  For example, "bribery" shall include the giving, offering or promise of an advantage to another person (whether that person is in the public or private sector) where (a) the advantage is intended to bring about or reward the improper performance by another person of a relevant function or activity, or (b) it is understood that the acceptance of the advantage itself constitutes the improper performance of the relevant function or activity. "Corruption" or "corrupt acts" are defined in the Foreign Corrupt Practices Act and include the wrongful giving, offering or promise of consideration to a foreign official, for the purposes of obtaining a commercial advantage.

For the avoidance of doubt, the foregoing representations and disclosures are "material" and failure to properly make such representations or disclosures shall be grounds to revoke this offer and/or terminate your employment for "Cause" (as that term is defined herein.)

This offer of employment is conditioned upon the successful completion of a pre-employment screening, including reference,  criminal and other checks, as well as on your satisfactorily meeting of all pre-employment requirements, including passing a drug screen and producing documentation to verify your identity and eligibility to work in the United States.  This offer is also conditioned on your having and maintaining in good standing all applicable licenses and registrations.  All necessary testing and/or registration requirements must be completed at the earliest practical time, or as otherwise required by your organizational unit, but in no event later than 120 days following your start of employment.  Failure to satisfy such requirements may be grounds for disciplinary action by Barclays, up to and including termination for Cause.

To accept, please sign and date this letter in the space provided below.  We look forward to having you on board.

Sincerely yours,

Andrea Rapaport
Human Resources
Barclays Capital Inc.
Barclays Bank PLC– NY Branch
Barclays Capital Services Corporation

I accept this offer of employment with Barclays on the terms and conditions stated above.

Accepted: _____        Date: _____
        George Lang

## Confidentiality and Intellectual Property Agreement

Confidential Information:  I acknowledge that both during and after my employment or engagement with Barclays Bank PLC or any of its affiliates ("Barclays"), I have a responsibility to protect and maintain the confidentiality of information belonging or relating to Barclays, its affiliates, and their clients and suppliers.  Such information includes, without limitation, Barclays' trade secrets, client lists, confidential information about or provided by a client or supplier or agent, information concerning Barclays or any client's or supplier's financial books and records, commitments, procedures, plans and prospects, financial products developed by Barclays or any of its affiliates, Barclays' or any of its clients' securities positions, trading strategies, any of their current or prospective transactions or business, employee compensation, any "inside information," and any other information that has been developed by or for the benefit of Barclays or its clients, regardless of whether such information is kept in hard copy or electronic form ("Confidential Information").

Accordingly, I agree to use and disclose the Confidential Information only as necessary in connection with my work for Barclays and in a manner I reasonably believe to be in the best interests of Barclays, and to use reasonable precautions and exercise due care to maintain the confidentiality of the Confidential Information.  This obligation will continue after the termination of my employment or engagement unless and until any such Confidential Information comes into the public domain (other than through any breach of this agreement).  Furthermore, following my employment or engagement with Barclays, I will promptly return to Barclays any tangible copies of any Confidential Information.  Nothing in this agreement will prevent me from disclosing Confidential Information to the extent required by law or legal process or from disclosing Confidential Information to the Securities and Exchange Commission or such other governmental or self-regulatory organization as may be expressly permitted under the Dodd-Frank Wall Street Reform and Consumer Protection Act or similar laws; however, to the extent permitted by law, I shall notify Barclays of any required disclosure as soon as reasonably practicable so that Barclays may take appropriate lawful steps to protect its Confidential Information.  I understand and acknowledge that the Confidential Information is the property of Barclays and/or its licensors, suppliers, vendors or current, prior or potential customers and that I have no rights to it other than to use it as specifically set forth above.

Finally, as a condition of my employment or engagement with Barclays, I acknowledge that I have been directed by Barclays not to bring or distribute to anyone at Barclays any confidential or proprietary documents or other information with me from any prior employer or to possess or use such information in violation of my obligations to a prior employer or other party.  I have complied with this directive and will continue to do so.

Ownership of Developments:  Effective as of the start of my employment or engagement with Barclays, I agree that any developments, designs, concepts, inventions, techniques and improvements (including without limitation computer software), copyrightable subject matter, proprietary information or other intellectual property ("Developments") which I conceive or make either solely or jointly with others, either on or off Barclays' premises, while during the course of my employment or while providing services to Barclays (whether or not conceived during regular business hours), and which (i) relates to any Barclays' products, business, services or activities or (ii) is suggested by or resulting from any work performed by me for Barclays, shall be a "work made for hire" within the scope and in the course of my employment and the property of Barclays.  To the extent that title to any such works may not by operation of law vest in Barclays or such works not be considered works for hire, I hereby irrevocably assign all rights, title and interests (whether existing or future) therein to Barclays.  I agree that I will immediately disclose all Developments to Barclays and will upon Barclays' request execute any and all documents necessary to convey or perfect all rights, title and interests in the Developments in any and all countries to Barclays.  Decisions as to the exploitation or protection of any Developments shall be in the sole and absolute discretion of Barclays.  These obligations continue after the termination of my employment or engagement with Barclays.

Signed by: ……………………………………………

Name: ………………………………………………..

Date: ………………………………………………

## Pay Notice and Acknowledgement, California or New York Employees

As required by state law, you are hereby notified as follows:

Compensation

> Base Salary:  Your base salary will be paid at the annual rate of $135,000.  Currently, salaries are paid semi-monthly on the last work day of each of the two monthly pay periods, which end on the15th and the last day of every month.

**IMPORTANT** – If English is not your primary language, please identify your primary language here: _____.

Acknowledgement

By my signature below, I affirm and acknowledge that I have received this notice in my primary language (which is English).  If English is not my primary language, I affirm and acknowledge that I have received this notice in English and have identified my primary language in the space above.  I understand that Barclays will determine whether an alternative form of this notice should be issued in my primary language.

Signature:     …………………………………..   Date: …………………
             George Lang

Barclays Services Corp., 745 Seventh Avenue, New York, New York 10019
To reach the payroll department, please call 1-800-323-3408

Workers Compensation Insurance Carrier:
Chartis (The Insurance Company of the State of Pennsylvania)
32 Old Slip, New York, NY 10005, Telephone: (646) 857-1633

This notice is being provided pursuant to state law;
it will be retained for the appropriate retention period which is currently identified as six years.